Slip Op. 19–71

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NATIONAL NAIL CORP., | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| SHANDONG ORIENTAL CHERRY | : |
| HARDWARE GROUP CO., LTD., | : |
| | : |
| Consolidated-Plaintiff, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

Before: Richard K. Eaton, Judge

Consol. Court No. 16-00052

**PUBLIC VERSION**

## <u>OPINION and ORDER</u>

[United States Department of Commerce's Remand Results are sustained, in part, and remanded.]

Dated: June 12, 2019

*Adams C. Lee*, Harris Bricken McVay Sliwoski, LLP, of Seattle, WA, argued for Plaintiff National Nail Corp.

*Brittney R. Powell*, Fox Rothschild LLP, of Washington, DC, argued for Consolidated-Plaintiff Shandong Oriental Cherry Hardware Group Co., Ltd. With her on the brief were *Lizbeth R. Levinson* and *Ronald M. Wisla*.

*Sosun Bae*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of Counsel on the brief was *Jessica R. DiPietro*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Eaton, Judge: This case involves a challenge to the United States Department of

Commerce's ("Commerce" or the "Department") final results of the sixth administrative review

of the antidumping duty order on imports of certain steel nails from the People's Republic of

China. *See Certain Steel Nails From the People's Rep. of China*, 73 Fed. Reg. 44,961 (Dep't

Commerce Aug. 1, 2008) ("Order"); *see also Certain Steel Nails From the People's Rep. of

China*, 81 Fed. Reg. 14,092 (Dep't Commerce Mar. 16, 2016), *amended by* 81 Fed. Reg. 19,136

(Dep't Commerce Apr. 4, 2016), and accompanying Issues and Dec. Mem. (Mar. 7, 2016), P.R.

259 ("Final IDM") (collectively, "Final Results"). The period of review was August 1, 2013,

through July 31, 2014. *Certain Steel Nails From the People's Rep. of China*, 80 Fed. Reg. 53,490

(Dep't Commerce Sept. 4, 2015), and accompanying Dec. Mem. for the Prelim. Results (Aug.

28, 2015), P.R. 217 ("Prelim. Dec. Mem.") at 1 (collectively, "Preliminary Results").

In *National Nail Corp. v. United States*, 42 CIT __, 279 F. Supp. 3d 1372 (2018)

("*National Nail I*"),[1] the court remanded the Final Results. In its remand order, the court

directed Commerce to "evaluate the evidence on the record regarding [Consolidated-Plaintiff

Shandong Oriental Cherry Hardware Group Co., Ltd.'s ("Shandong"[2])] eligibility for a separate

[dumping] rate, including the information it submitted in response to Section A of Commerce's

questionnaire [regarding corporate structure], and determine whether such evidence demonstrates

an absence of *de jure* and *de facto* control by the Chinese government." *National Nail I*, 42 CIT

at __, 279 F. Supp. 3d at 1379. The court further directed that "if Commerce determines that

Shandong is eligible for a separate rate, it shall determine a separate rate" for the company. *Id.*

---

[1]        Familiarity with *National Nail I* is presumed.

[2]        In this opinion, "Shandong" refers to the collapsed Shandong entity, which
includes Consolidated-Plaintiff Shandong Oriental Cherry Hardware Group Co., Ltd. and its
affiliates Jining Dragon Fasteners Ltd., Shandong Oriental Cherry I&E, Jining Huarong
Hardware, Heze Products Co., and Jining Yonggu Metal. *See* Prelim. Dec. Mem. at 10.

Commerce's remand results are now before the court. *See Final Results of Redetermination Pursuant to Remand Order in National Nail Corp. v. United States*, Consol. Ct. No. 16-00052 (Apr. 20, 2018) ("Remand Results"). In the Remand Results, Commerce determined, under protest,[3] that Shandong was eligible for a separate dumping rate. *See* Remand Results at 6. Commerce did not, however, determine a rate using the production and U.S. sales information that Shandong placed on the record in response to Commerce's questionnaires. Rather, Commerce assigned Shandong the highest rate from any prior segment—the China country-wide dumping rate of 118.04 percent[4]—based on "total adverse facts available."[5] Remand Results at 19.

Commerce's decision to use "total adverse facts available" rested on its conclusion that Shandong's reported production and sales information was incomplete, inaccurate, or unreliable, and that, therefore, none of it was usable. *See* Remand Results at 15-17. Thus, Commerce found that "necessary information" was missing from the record. On this basis, Commerce found that

---

[3]      Since the court did not instruct Commerce to find that Shandong was entitled to a separate rate, but merely to "evaluate the evidence," it is difficult to see what is "under protest."

[4]      The 118.04 percent rate was originally an estimated dumping margin based on information found in the petition filed by Mid Continent Nail Corp. and other domestic producers in 2007. *Certain Steel Nails from the People's Rep. of China and the United Arab Emirates*, 72 Fed. Reg. 38,816, 38,821 (Dep't Commerce July 16, 2007) (initiation of antidumping duty investigations). By way of comparison, the highest rate determined for any cooperating respondent in this segment of the proceeding was 11.95 percent. Final Results, 81 Fed. Reg. at 19,136.

[5]      Although, in the Preliminary Results, Commerce did not include the adjective "total" before "adverse facts available," it made the equivalent statement that "the entirety of [Shandong's] responses need[ed] to be disregarded for the preliminary results." Prelim. Dec. Mem. at 27. In its subsequent memoranda, Commerce referred to its finding as "total adverse facts available." *See* Final IDM at 2 ("[W]e continue to apply total adverse facts available . . . to [Shandong].); Remand Results at 3 (citing use of "total adverse facts available" in the Preliminary Results and Final IDM).

the use of "facts otherwise available," pursuant to 19 U.S.C. § 1677e(a) (2012),[6] was authorized. *See* Remand Results at 17 ("[T]he application of facts available is warranted because [Shandong] failed to provide necessary information requested by Commerce, in the form and manner requested, and significantly impeded our ability to conduct the review."). Additionally, Commerce found that Shandong had failed to comply with Commerce's requests for information to "the best of its ability," and applied an adverse inference to all of the facts available for sales and production. *See* 19 U.S.C. § 1677e(b)[7]; *see also* Remand Results at 17-18 ("[B]ecause [Shandong's] deficiencies were so pervasive, impeding Commerce's ability to conduct its review, and [Shandong] did not cooperate to the best of its ability, Commerce determined that total [adverse facts available] . . . was warranted."). As noted, Shandong was assigned the 118.04 percent rate. In the immediately preceding administrative review, Shandong Oriental Cherry Hardware Group Co., Ltd. (exclusive of its affiliates) was found to be eligible for a separate rate and was assigned the rate of 16.62 percent. *Certain Steel Nails from the People's Rep. of China*, 80 Fed. Reg. 18,816, 18,817 (Dep't Commerce Apr. 8, 2015) (final results of fifth admin. review).

Plaintiff National Nail Corp. is a U.S. importer of subject merchandise produced and exported during the period of review by Consolidated-Plaintiff Shandong, a mandatory

---

[6]     The statute provides that Commerce shall use facts available "[i]f . . . necessary information is not available on the record, or . . . an interested party or any other person . . . fails to provide . . . information [that has been requested by Commerce] . . . in the form and manner requested," or "significantly impedes" a proceeding. 19 U.S.C. § 1677e(a)(1)-(2)(B), (C).

[7]     Where Commerce determines that the use of facts available is warranted, it must make the requisite additional finding that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information" before it may use an adverse inference "in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1)(A).

respondent (collectively, "Plaintiff" or "National Nail"). National Nail disputes Commerce's use of "total adverse facts available" to assign a rate for the respondent. Specifically, National Nail argues that Commerce's use of "facts otherwise available," as to Shandong's factors of production and U.S. sales,[8] was not supported by substantial evidence because Shandong provided the production and sales information that Commerce asked for in the form and manner requested. National Nail also contends that substantial evidence does not support Commerce's finding that Shandong failed to comply with the Department's information requests to "the best of its ability." Thus, for Plaintiff, Commerce's decision to find "unusable" all of the production and sales information Shandong provided and, instead, to use "total adverse facts available" to arrive at a dumping margin for Shandong lacks the support of substantial evidence and is not in accordance with law. *See* National Nail's Cmts. on Remand Results 5, ECF No. 70 ("NN's Cmts."). For its part, Shandong "agrees with and adopts the comments filed by National Nail Corp. in response to Commerce's remand results." Shandong's Cmts. on Remand Results 1, ECF No. 71.

Defendant the United States, on behalf of Commerce, urges the court to sustain the Remand Results. *See* Def.'s Resp. Pls.' Cmts. on Remand Results, ECF No. 74 ("Def.'s Resp. Cmts.").

Jurisdiction is found under 28 U.S.C. § 1581(c) (2012) and 19 U.S.C. § 1516a(a)(2)(B)(iii).

---

[8]     As discussed *infra*, Part III, among the U.S. sales with respect to which Commerce used facts available were Shandong's affiliate Jining Dragon Fasteners Ltd.'s sales of shooting nails. As shall be seen, National Nail concedes that Shandong did not provide the information Commerce asked for to determine whether the shooting nails met the criteria for exclusion from the Order, but claims, nonetheless, it was unreasonable for Commerce to resort to adverse facts available with respect to those sales.

Commerce's application of total adverse facts available in the Remand Results is neither supported by substantial evidence nor in accordance with law.[9] That is, neither the law nor the facts support the Department's findings (1) that none of Shandong's factors of production or its U.S. sales information was usable, and (2) that Shandong failed to comply with Commerce's requests for production and sales information to the best of its ability. Therefore, the court remands this matter to Commerce for further action in accordance with this Opinion and Order.

## BACKGROUND

### I.    Administrative Review Proceeding

On September 30, 2014, Commerce commenced the sixth administrative review of the Order at the request of, among others, Mid Continent Steel & Wire, Inc., a U.S. producer of steel nails and the petitioner in the proceeding, and The Stanley Works (Langfang) Fastening Systems Co., Ltd. and Stanley Black & Decker, Inc. ("Stanley"), a producer and importer of steel nails from China. *See Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 79 Fed. Reg. 58,729 (Dept. Commerce Sept. 30, 2014); *see also* Mid Continent Steel & Wire, Inc.'s Req. for Admin. Rev. (Aug. 29, 2014), P.R. 3; Stanley's Req. for Admin. Rev. (Aug. 28, 2014), P.R. 1.

The Order described the steel nails included in its scope, and expressly excluded others. Among the merchandise excluded from the Order were "fasteners suitable for use in powder-actuated hand tools, not threaded and threaded, which are currently classified under [Harmonized Tariff Schedule of the United States subheadings] 7317.00.20 and 7317.00.30."

---

[9]      As shall be seen, the court sustains that portion of the Remand Results only with respect to the application of adverse facts available to shooting nails produced by Shandong's affiliate Jining Dragon Fasteners Ltd. ("Jining Dragon"). These nails constituted 0.001 of total period of review sales.

Order, 73 Fed. Reg. at 44,961.

Commerce selected two mandatory respondents for individual review, Shandong and Stanley. Because China is a nonmarket economy country, [10] each company was sent Commerce's standard nonmarket economy antidumping questionnaire seeking information on factors of production[11] (Section D); U.S. sales[12] (Section C); and corporate structure[13] (Section A). *See* Commerce's Orig. Questionnaire (Nov. 20, 2014), P.R. 31, ECF No. 52-6. Between April 2015 and July 2015, Commerce issued supplemental questionnaires. Responses were

---

[10]     A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).

[11]     Factors of production are the inputs consumed to produce the subject merchandise. In nonmarket economy cases, such as those involving imported merchandise from China, Commerce uses "the input amounts [reported by the exporter], along with the appropriate price from the chosen surrogate country, to construct the normal value of the merchandise under consideration." Commerce's Orig. Quest. (Nov. 20, 2014), P.R. 31, ECF No. 52-6 at D-1; *see* 19 U.S.C § 1677(c) (describing method to determine normal value in nonmarket economy cases).

[12]     In nonmarket economy cases, Commerce "compare[s] the prices at which [the subject merchandise] was sold in or to the United States with a constructed value using the factors of production to determine whether the merchandise was sold at less than normal value in the United States during the [period of review]." Commerce's Orig. Quest. at C-1; *see* 19 U.S.C. §§ 1677a (describing export price and constructed export price), 1677(34) (defining "dumping" as the "sale or likely sale of goods at less than fair value"); 1677(35)(A) (defining "dumping margin" as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise").

[13]     Commerce's questionnaire seeks information about a respondent's "organization and accounting practices, and general information regarding sales of the merchandise under review." Commerce's Orig. Quest. at G-2. In Section A of the questionnaire, Commerce asks for information that pertains to a respondent's eligibility for a separate rate, including *de jure* and *de facto* independence from government control. *Id*. at A-1 to -6.

received between May 2015 and August 2015.

###    A.    Factors of Production Information

With respect to Shandong's factors of production, Commerce and Shandong went back and forth on an acceptable reporting method. Initially, Commerce asked Shandong to report the actual or estimated amounts of the factors of production used to make the subject merchandise solely on a *CONNUM-specific* basis.[14] Commerce's Orig. Questionnaire at D-2, D-6. Later, when Shandong made it clear that, because of the way it kept its records and because of its production processes, it could only report some factors of production (*e.g.*, wire rod used in the wire-drawing workshop[15]) on a CONNUM-specific basis, and that it could report other factors of production (*e.g.*, chemicals and water used in the electrogalvanization or "EG" workshop) on a "production-group"[16] basis, Commerce agreed that Shandong could report its factors of

---

[14]    "A 'CONNUM' is a control number assigned to materially-identical products to distinguish them from non-identical, *i.e.*, similar, products." *Eregli Demir ve Celik Fabrikalari T.A.S v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1297, 1321 n.34 (2018) (citation omitted).

[15]    Shandong's nail production happens in workshops: "There are three basic production processes to make nails: wire-drawing, nail-making, and polishing, with each process handled in an individual workshop. And there are seven other optional production processes handled in seven other workshops," including, for example, electrogalvinization. *See* Shandong's Sec. C and D Questionnaire Resp. (Jan. 13, 2015), P.R. 95, ECF No. 52-11 at D-4, D-6.

[16]    Here, a production group consists of nails having different CONNUMs that have identical factors of production. *See* Shandong's Third Suppl. Sec. A and C and Fourth Suppl. Sec. D Questionnaire Resp. (July 21, 2015), P.R. 208, ECF No. 52-33 at 34 ("Different CONNUM[s] [have] identical [factors of production] if they belong to the same production group."). The record shows that Shandong categorized the subject merchandise into thirteen production groups: Common Nails, Duplex Nails, RS Nails, VC Sinker Nails, EG Nails, EG RS Nails, HDG Nails, HDG RS Nails, Concrete Nails, RS Pole Barn Nails, HDG RS Pole Barn Nails, Cut Masonry Nails, and HDG Cut Masonry Nails. "Each one of these thirteen product[/production] groups represents a different combination of [f]ield numbers of 3.1 (nail form), 3.4 (steel type), 3.5 (surface finish), 3.6 (shank style) and 3.9 (nail head style) to form a specific CONNUM and has different production steps." Shandong's Second and Third Sec. D

(footnote continued . . .)

production "either on a production-group basis or on a CONNUM-specific basis." Commerce's

Fourth Sec. D Suppl. Quest. to Shandong (June 25, 2015), P.R. 190, ECF No. 52-28 at 16

("Please revise [Shandong's] reported amounts for each [factor of production] and ensure that

they are allocated either on a production-group basis or on a CONNUM-specific basis."); *see

also* Def.'s Resp. Cmts. 10 (quoting Remand Results at 16) ("It is true that Commerce permitted

[Shandong] to report its factors of production on 'a less-than CONNUM-specific basis.'"). No

matter which method was selected, however, for Commerce, "it was 'unacceptable to report a

single average [factors of production] usage ratio for all CONNUMs in [the] Section D

database.'"[17] Final IDM at 36 (quoting Commerce's Second Suppl. Sec. D Quest. to Shandong

(Apr. 27, 2015), P.R. 139, ECF No. 52-13 at 4).

Ultimately, Shandong reported some of its factors of production on a CONNUM-specific

basis, and others on a production-group basis. Commerce found, however, that none of the

factors information was usable, because, according to the Department, some of the factors of

production were reported on a single-average basis. Therefore, for Commerce, necessary factors

of production information was "missing" from the record. *See* Final IDM at 43.

**B.     U.S. Sales Information**

With respect to U.S. sales, Commerce asked Shandong to, among other things, reconcile

_____

Suppl. Resp. (June 5, 2015), P.R. 165, ECF No. 52-18 at 4.

[17]     In the first reviews of the Order, Commerce did not require respondents to report factor of production consumption amounts on a CONNUM-specific basis. Reporting on a single-average basis was acceptable. In the final results of the third administrative review, however, Commerce stated that, going forward, it would require "all 'respondents . . . [to] report all [factors of production] data on a CONNUM-specific basis using all product characteristics in subsequent reviews.'" Final IDM at 37 n.197 (quoting *Certain Steel Nails From the People's Rep. of China*, 78 Fed. Reg. 16,651 (Dep't Commerce Mar. 18, 2013) and accompanying Issues and Dec. Mem. at Comment 5).

its period of review sales data with other sales data for the two fiscal years that overlapped the

period of review (August 1, 2013 to July 31, 2014), and to provide a narrative explanation of

"how all worksheets and supporting documentation tie together."[18] Commerce's Orig.

Questionnaire app. V(A).

Initially, in its December 24, 2014 Section A submission (the "December 2014

Submission"), Shandong provided audited financial statements covering all of 2013, and

monthly internal financial reports for all of 2014, except November and December. *See*

Shandong's Sec. A Questionnaire Resp. (Dec. 24, 2014), C.R. 36, ECF No. 51-2 Ex. A-18 (2013

audited financial statement) and A-19 (2014 monthly internal financial reports). In the December

2014 Submission, Shandong "noted . . . that it was not submitting the full, audited . . . 2014

financial statement because the financial statement would not be ready until later in the year."

Final IDM at 44. November and December 2014 were outside of the period of review.

In its January 13, 2015 Section C submission (the "mid-January 2015 Submission"), filed

a few weeks after the December 2014 Submission, Shandong continued to omit the November

and December 2014 sales data, but did not reiterate the explanation it had offered in its previous

submission. *See* Final IDM at 44 (noting Shandong "failed to provide an explanation in its

Section C response as to why it was not reporting the complete monthly sales data for [2013 and

2014]"). It is worth noting that, given its previous explanation, it is hardly surprising that

Shandong should not have audited financials for November and December since its Section C

submission was made on January 13, 2015—thirteen days after the company closed its books for

---

[18]     Commerce's questionnaire asked for accounting and financial information of
Shandong and its affiliates, including audited financial statements and internal (unaudited)
financial statements that are "prepared and maintained in the normal course of business for the
merchandise under review." Commerce's Orig. Questionnaire at A-7.

the year.

Six months later, in June 2015, Commerce sought the November and December 2014 data by way of supplemental questionnaire. *See* Final IDM at 45. In its July 2015 response (the "July 2015 Submission"), Shandong provided the missing internal financial reports for November and December 2014, along with an explanation as to why they were not included in Shandong's original response, *i.e.*, that they were not available at the time its response was filed. As for the requested narrative explanation tying the sales reconciliation to the 2013 and 2014 financial statements, Shandong provided that, too. *See* Final IDM at 46. Thus, Shandong placed the missing sales information on the record in response to Commerce's supplemental questionnaire. Indeed, all of the information Shandong placed on the record with respect to 2013 and 2014, including the November and December 2014 information, the explanation for why it was not provided when initially requested, and the narrative explanation tying the sales reconciliation to the 2013 and 2014 financial statements, was provided by way of timely filed responses to Commerce's supplemental questionnaires.

In addition to providing the information that Commerce requested, in the July 2015 Submission Shandong made unsolicited revisions to its sales data, decreasing the quantity of subject merchandise sold in two months of the period of review (August 2013 and December 2013), which had the effect of decreasing the total quantity of sales to the United States by approximately one percent. Shandong did not offer an explanation for these revisions. *See* Final IDM at 46.

### C.    Shooting Nails Information

With respect to shooting nails, Shandong reported that its affiliate Jining Dragon sold a

small number[19] of shooting nails in the United States during the period of review. Shandong

claimed, however, that Jining Dragon's sales of shooting nails were excluded from the Order

because they were "fasteners suitable for use in powder-actuated hand tools, not threaded and

threaded, which are currently classified under [Harmonized Tariff Schedule of the United States

subheadings] 7317.00.20 and 7317.00.30." Order, 73 Fed. Reg. at 44,961. Based on this claim,

Shandong asked that it be excused from reporting Jining Dragon's factors of production and

sales information for its shooting nails sales. *See* Shandong's Letter Requesting Rescission of

Question 10 of the June 25, 2015 Quest. (July 1, 2015), P.R. 192, ECF No. 52-29 at 2.

On July 2, 2015, Commerce conditionally withdrew[20] its request that Shandong provide

Jining Dragon's production and U.S. sales databases for the allegedly excluded shooting nails,

but continued to seek information as to whether the nails were, in fact, excluded from the scope

of the Order. Specifically, Commerce asked Shandong: "For two product codes of shooting

nails . . . please provide product specifications or model diagrams, of each product type's head

style, point style, shank style, *and the hand tool with material [i.e., "powder"] used in the hand*

---

[19]     In its case brief, Shandong argued that shooting nails "constitute only 0.001 of
total quantity sold in the [period of review]." Shandong Case Br. (Nov. 2, 2015), P.R. 245 at 46.

[20]     Commerce stated:

Based on [Shandong's] letter, the Department, at this time, is hereby excusing
[Jining Dragon] from submitting a Section C and D database. However, the
Department requires that [Jining Dragon] answer the other portions of questions
10(a)-(g) regarding its production and sales of shooting nails, the specifications of
these shooting nails, etc. Based on [Jining Dragon] response to these questions
and the record documentation that it provides regarding these "shooting" nails, the
Department will consider whether it is necessary to request that [Jining Dragon]
submit a Section C and D database.

Commerce's Letter to Shandong re: Shandong's Request for Excusal (July 2, 2015), P.R. 194,
ECF No. 52-31.

*tool to shoot this nail, along with supporting documentation.*" Final IDM at 54 (citation omitted) (emphasis added). In response, Shandong did not supply the requested supporting documentation, but simply repeated its assertion that "the shooting nails were used in a 'shooting gun' and that material used was 'gunpowder.'" Final IDM at 54 (citation omitted).

## II.     The Preliminary Results

The Department published the Preliminary Results on August 28, 2015,[21] in which it found that the use of total adverse facts available with respect to Shandong was justified. First, Commerce found that the use of "facts otherwise available" was warranted because necessary information was "missing" from the record for Shandong's production and sales, and for Jining Dragon's shooting nails. Commerce stated:

> During the course of this review, the Department discovered that [Shandong] withheld key information that was requested by the Department for calculating an accurate margin for [Shandong]. Specifically, [Shandong] failed to provide in the form and manner requested by the Department: (1) an accurate, reliable sales reconciliation regarding its reported sales of subject merchandise to the United States during the [period of review]; (2) an accurate, reliable factors of production . . . database that is reported on a [CONNUM]-specific basis; and (3) sales data, [factors of production] data, and full product specifications, including supporting documentation regarding the hand tool that the shooting nails are used in, from [Shandong's] affiliate, [Jining Dragon], regarding its sales of shooting nails to the United States during the [period of review]. Additionally, [Shandong] along with its affiliate, [Jining Dragon], significantly impeded the proceeding by not providing accurate or complete responses to the Department's questions about its U.S. sales data and [factors of production] data regarding its sales of subject merchandise to the United States during the [period of review].

Prelim. Dec. Mem. at 14; *see also* 19 U.S.C. § 1677e(a). Thus, Commerce found that because the information that Shandong provided in its questionnaire responses was "so incomplete . . . the entirety of the responses need[ed] to be disregarded for the preliminary results." Prelim. Dec.

---

[21]     Commerce fully extended the deadline for the Preliminary Results, *i.e.*, by 120 days, until August 31, 2015. *See* Prelim. Dec. Mem. at 2.

Mem. at 27. In other words, Commerce found that none of Shandong's reported production and sales information was usable.

With respect to Jining Dragon's shooting nails sales, Commerce found that Shandong had failed to show that the nails were outside the scope of the Order. For Commerce, this failure was significant because the Department's withdrawal of its request for Jining Dragon's factors of production and U.S. sales databases was conditioned on Shandong providing information that showed Jining Dragon's shooting nails were excluded from the scope of the Order. Since Shandong failed to meet that condition, and failed to provide the requested databases, Commerce found that necessary information was missing from the record for the shooting nails. *See* Prelim. Dec. Mem. at 25.

Additionally, in the Preliminary Results, Commerce found that Shandong had failed to comply with the Department's requests for information to "the best of its ability," under 19 U.S.C. § 1677e(b)(1). Commerce stated:

> [D]espite the Department's detailed and specific questionnaires, [Shandong] failed to meet its statutory duty to reply accurately and completely to requests for information regarding its affiliates, and the production and sales of subject merchandise. For example, the Department finds that [Shandong] failed to provide: (1) an accurate, reliable sales reconciliation regarding its reported sales of subject merchandise to the United States during the [period of review]; and (2) sales data, [factors of production] data, and full product specifications, including supporting documentation regarding the hand tool that the shooting nails are used in, from [Shandong's] affiliate, [Jining Dragon], regarding its sales of shooting nails to the United States during the [period of review]. Accordingly, the Department finds that [Shandong] failed to cooperate to the best of its ability, pursuant to [19 U.S.C. § 1677e(b)]. Therefore, we are applying [adverse facts available] to [Shandong] for these preliminary results.

Prelim. Dec. Mem. at 27-28. Thus, the findings that Commerce claimed supported its decision to use facts otherwise available, *i.e.*, that necessary information was missing from the record, were also cited by Commerce to support the conclusion that Shandong had failed to comply with the

Department's requests for information to "the best of its ability." For Commerce, its questionnaires clearly identified the production and sales information Commerce was looking for, and Shandong simply "chose not to" provide that information. Prelim. Dec. Mem. at 14-15. Importantly, Commerce relied solely on Shandong's alleged failure to supply requested information relating to the reconciliation of 2013 and 2014 sales data and shooting nails to support its adverse inferences finding.

Consequently, the Department found that because (1) none of the information Shandong provided as to its factors of production, U.S. sales, and Jining Dragon's shooting nails was usable, and that (2) Shandong failed to do its best to comply with Commerce's requests for information, "total adverse facts available" should be employed to determine Shandong's antidumping duty rate. Commerce then preliminarily determined that Shandong was a part of the country-wide entity and assigned it the country-wide rate of 118.04 percent.[22] *See* Prelim. Dec. Mem. at 28.

### III.    The Final Results

After the Preliminary Results were published, Commerce received comments and case briefs from interested parties. The Department then issued the Final Results on March 7, 2016. In the Final Results, Commerce again found that "it is appropriate to apply total [adverse facts available] to [Shandong] for these final results." Final IDM at 31. The reasons provided by

---

[22]    Commerce assigns the country-wide entity rate if a respondent does not establish independence from state control. *See Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002) ("Under the [nonmarket economy] presumption, a company that fails to demonstrate independence from the [nonmarket economy] entity is subject to the countrywide rate, while a company that demonstrates its independence is entitled to an individual rate as in a market economy."); *see also Hubbell Power Sys., Inc. v. United States*, 43 CIT __, __, 365 F. Supp. 3d 1302, 1306-07 (2019).

Commerce for using "facts available" were largely those found in the Preliminary Results. *See* Final IDM at 33 (reciting reasons stated in Prelim. Dec. Mem. at 27-28).

In addition, Commerce continued to find that Shandong had failed to cooperate to "the best of its ability," and, thus, that the use of an adverse inference was warranted, with respect to Shandong's production and sales information. Commerce found:

> Pursuant to [19 U.S.C. § 1677e(b)], the Department continues to find that [Shandong] failed to cooperate by not acting to the best of its ability to comply with the Department's requests for information and that the application of [adverse facts available] is warranted. In sum, . . . despite the Department's detailed and specific requests for information through the issuance of multiple questionnaires, [Shandong] failed to meet its statutory duty to reply accurately and completely to requests for information regarding its affiliates, and the production and sales of subject merchandise. Specifically, [Shandong] failed to provide: 1) an accurate, reliable [factors of production] database that is reported on a CONNUM-specific basis; 2) an accurate, reliable sales reconciliation regarding its reported sales of subject merchandise to the United States during the [period of review]; and 3) sales data, [factors of production] data, and full product specifications for the shooting nails of [Shandong's] affiliate, [Jining Dragon]. In this regard, the Department finds . . . that [Shandong], from the outset, failed to follow specific instructions, repeatedly misrepresented the data it was submitting to the Department, and repeatedly failed to explain adequately why it needed to make revisions to data previously submitted to the Department. Accordingly, and based on the totality of the evidence discussed [in the Final IDM], the Department continues to find that [Shandong] failed to cooperate to the best of its ability, pursuant to [subsection 1677e(b)]. Therefore, we are applying [adverse facts available] to [Shandong] for these final results.

Final IDM at 58-59. Thus, in the Final Results, Commerce again recited its facts available findings to support its further finding that Shandong had failed to cooperate with Commerce's requests to the best of its ability.[23] *See* Final IDM at 59.

---

[23]    In the Final Results, Commerce also found that Shandong was not eligible for its own calculated rate because none of Shandong's separate rate information was reliable. *See* Final IDM at 60 (noting that "the Department found that [Shandong's] submissions were generally so incomplete and unreliable that we could not use them for . . . , *e.g.*, determining separate rate eligibility").

National Nail and Shandong commenced this consolidated action to dispute Commerce's findings and determinations in the Final Results, including the Department's decision to deny Shandong a separate rate and its use of total adverse facts available. In *National Nail I*, the court remanded this matter to Commerce, directing the Department to "evaluate the evidence on the record regarding Shandong's eligibility for a separate rate, including the information it submitted in response to Section A of Commerce's questionnaire, and determine whether such evidence demonstrates an absence of *de jure* and *de facto* control by the Chinese government." *National Nail I*, 42 CIT at __, 279 F. Supp. 3d at 1379. The court further ordered that "if Commerce determines that Shandong is eligible for a separate rate, it shall determine a separate rate for Shandong." *Id*.

## IV.   The Remand Results

On April 20, 2018, Commerce published the Remand Results. On remand, Commerce determined that Shandong was eligible for a separate dumping rate because the record supported the finding that Shandong demonstrated an absence of *de jure* and *de facto* government control. *See* Remand Results at 8-12; *see also id.* 10 (finding, "under protest, . . . that the deficiencies identified in [Jining Dragon's] separate rate reporting do not undermine [Shandong's] entitlement to a separate rate."). Commerce did not, however, determine a rate using any of the production and sales information that Shandong had placed on the record in response to its questionnaires. Rather, the Department again assigned Shandong the rate of 118.04 percent as the total adverse facts available rate, *i.e.*, the highest rate on the record of this proceeding, and restated its findings from the Final Results. *See* Remand Results at 12, 15-18.

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

### I.      Facts Available and Adverse Inferences

In an antidumping proceeding, Commerce relies primarily on the interested parties' submissions of factual information to create an administrative record. *See* 19 C.F.R. § 351.301(a) (2015) ("The Department obtains most of its factual information in antidumping . . . proceedings from submissions made by interested parties during the course of the proceeding."); *see also QVD Food Co. v. United States,* 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citations omitted) ("Although Commerce has authority to place documents in the administrative record that it deems relevant, the burden of creating an adequate record lies with interested parties and not with Commerce."). "If . . . necessary information is not available on the record, or . . . an interested party or any other person . . . fails to provide . . . information [that has been requested by Commerce] . . . in the form and manner requested, subject to [19 U.S.C. § 1677m(c)(1)[24] and

---

[24]      This subsection provides in pertinent part:

If an interested party, promptly after receiving a request from [Commerce] . . . for information, notifies [Commerce] . . . that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, [Commerce] . . . *shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden*

(footnote continued . . .)

(e)[25]," or "significantly impedes" a proceeding, the statute provides that Commerce "shall, subject to [19 U.S.C. § 1677m(d)[26]], use the facts otherwise available." 19 U.S.C. § 1677e(a)(1)-(2)(B), (C); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (discussing adverse facts available statutory framework).

Prior to 1994, "whenever a party or any other person refuse[d] or [was] unable to produce information requested in a timely manner and in the form required, or otherwise significantly impede[d] an investigation," Commerce made its determinations on the basis of the "best information otherwise available." 19 U.S.C. § 1677e(c) (1988).[27] "The purpose of the [best

---

*on that party.*

19 U.S.C. § 1677m(c)(1) (emphasis added).

[25]      Subsection (e) provides that Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by [Commerce]," if five conditions are met:

> (1) the information is submitted by the deadline established for its submission, (2) the information can be verified, (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination, (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information, and (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e)(1)-(5).

[26]      If Commerce receives a response to a request for information that it finds deficient, the statute requires Commerce to "promptly inform the person submitting the response of the nature of the deficiency and . . . to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency" bearing in mind the timeframe permitted for reviews. 19 U.S.C. § 1677m(d). If Commerce finds that further submissions by that person in response to such deficiency are untimely or "not satisfactory," Commerce may, subject to subsection (e), "disregard all or part of the original and subsequent responses." *Id.*

[27]      The 1988 version of subsection 1677e(c), "Determinations to be made on best information available," read in pertinent part, "In making [its] determinations under this title,

(footnote continued . . .)

information available] provision [was] to induce respondents to provide Commerce with timely,

complete and accurate information so that Commerce [could] determine dumping margins as

accurately as possible." *Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v.*

*United States*, 18 CIT 906, 915, 865 F. Supp. 857, 865 (1994) (citation omitted), *aff'd*, 68 F.3d

487 (Fed. Cir. 1995).

     Under the best information available standard, Commerce employed either "total best

information available" or "partial best information available." As described by this Court:

> For "total [best information available]" the respondent's entire dumping margin is
> calculated upon the basis of [best information available]. Commerce uses "total
> [best information available]" for a respondent whose reporting or verification
> failure is *so extensive as to make its entire response unreliable*. Commerce's
> choice of a particular [best information available] rate is dependent upon whether
> the respondent is deemed to have been "cooperative" or "uncooperative."
> Commerce will use the highest possible [best information available] rate for an
> "uncooperative" respondent.
>
> Commerce applies "partial [best information available]" when a respondent's
> submitted information is *deficient in limited respects*, yet is still reliable in most
> other respects. In a "partial [best information available]" situation, Commerce
> alleges it does not consider the level of cooperation of the respondent.

*Id.*, 18 CIT at 915 n.21, 865 F. Supp. at 865 n.21 (emphasis added). Thus, use of total best

information available was authorized when all of the information on the record was unreliable,

and partial best information available was used when only some of the information was

unreliable.

---

[Commerce] . . . shall, whenever a party or any other person refuses or is unable to produce
information requested in a timely manner and in the form required, or otherwise significantly
impedes an investigation, use the best information otherwise available." 19 U.S.C. § 1677e(c)
(1988).

According to the Statement of Administrative Action ("SAA"),[28] the use of best information available was considered "an essential investigative tool in antidumping and countervailing duty proceedings," because its potential use "provide[d] the only incentive to foreign exporters and producers to respond to Commerce questionnaires." SAA accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 at 868 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.

In 1994, Congress enacted the Uruguay Round Agreements Act, incorporating into U.S. law the Uruguay Round agreements that were negotiated and adopted by the members of the World Trade Organization. *See* Uruguay Round Amendments Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). The Act more clearly defined the use of adverse type inferences in making dumping determinations. The 1994 law divided Commerce's procedure into two parts. First, if there was necessary information missing from the record, or the other statutory prerequisites were satisfied, Commerce was directed to use "facts otherwise available." 19 U.S.C. § 1677e(a) (1994)[29]; *see also* SAA at 869, 1994 U.S.C.C.A.N. at 4198 ("New section 776(a) requires

---

[28]      The SAA is "an authoritative expression" of legislative intent when interpreting and applying the Uruguay Round Agreements Act. *See* 19 U.S.C. § 3512(d).

[29]      The 1994 version of subsection 1677e(a), which is the same in substance to the version currently in effect, provided, in pertinent part:

> If . . . necessary information is not available on the record, or . . . an interested party or any other person . . . (A) withholds information that has been requested by [Commerce] . . . , (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested . . . , (C) significantly impedes a proceeding . . . , or (D) provides such information but the information cannot be verified . . . , [Commerce] . . . shall, subject to [19 U.S.C. § 1677m(d)], use the facts otherwise available in reaching the applicable determination under this subtitle.

(footnote continued . . .)

Commerce . . . to make determinations on the basis of the facts available where requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information."). The statute did not foresee a situation where all of the information that was placed on the record would be found unusable. Rather, the idea was that facts available would be used to fill gaps where some information was not on the record. *See Nippon Steel*, 337 F.3d at 1381.

The second part of the new procedure permitted Commerce to draw adverse inferences from among the facts available, if a party failed to cooperate to "the best of its ability" with Commerce's requests for information. *See* 19 U.S.C. § 1677e(b) (1994)[30]; *see also* SAA at 870, 1994 U.S.C.C.A.N. at 4199 ("[N]ew section 776(b) permits Commerce . . . to draw an adverse inference where a party has not cooperated in a proceeding. A party is uncooperative if it has not acted to the best of its ability to comply with requests for necessary information."). Thus, adverse facts available would necessarily be less favorable to the respondent than would normally be the case with just facts available. *See* SAA at 870, 1994 U.S.C.C.A.N. at 4199 ("Where a party has

---

19 U.S.C. § 1677e(a) (1994); *see also* 19 U.S.C. § 1677e(a) (2012).

[30]    The 1994 version of subsection 1677e(b) provided, in pertinent part:

If [Commerce] . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce] . . . , [Commerce] . . . , in reaching the applicable determination . . ., may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from . . . (1) the petition, (2) a final determination in the investigation . . . , (3) any previous review under [19 U.S.C. § 1675] or determination under [19 U.S.C. § 1675b], or (4) any other information placed on the record.

19 U.S.C. § 1677e(b) (1994).

not cooperated, Commerce . . . may employ adverse inferences about the missing information to

ensure that the party does not obtain a more favorable result by failing to cooperate than if it had

cooperated fully.").

Construing the language and legislative history of section 1677e, the Federal Circuit has

described a two-part analysis:

> The statute has two distinct parts respectively addressing two distinct
> circumstances under which Commerce has received less than the full and
> complete facts needed to make a determination. Under subsection (a), if a
> respondent "fails to provide [requested] information by the deadlines for
> submission," Commerce shall fill in the gaps with "facts otherwise available."
> The focus of subsection (a) is respondent's *failure to provide information*. The
> reason for the failure is of no moment. The mere failure of a respondent to furnish
> requested information—for any reason—requires Commerce to resort to other
> sources of information to complete the factual record on which it makes its
> determination. As a separate matter, subsection (b) permits Commerce to "use an
> inference that is adverse to the interests of [a respondent] in selecting from among
> the facts otherwise available," only if Commerce makes the separate
> determination that the respondent "has failed to cooperate by not acting to the best
> of its ability to comply." The focus of subsection (b) is respondent's *failure to
> cooperate to the best of its ability, not its failure to provide requested information*.

*Nippon Steel*, 337 F.3d at 1381 (emphasis added) (construing 19 U.S.C. § 1677e (2000)[31]); *see

also F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032

(Fed. Cir. 2000) (noting, where a respondent is uncooperative, adverse facts available "will

create the proper deterrent to non-cooperation with [Commerce's] investigations"); *Ta Chen

Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002) (citing *De

Cecco*, 216 F.3d at 1032). Thus, the use of "facts otherwise available," to fill in gaps, applies

---

[31]     The Federal Circuit's *Nippon Steel* opinion construed the 2000 version of
subsections 1677e(a) and (b). Although Trade Preferences and Extension Act of 2015 amended
certain parts of § 1677e(b), the statutory language that is relevant here, remained unchanged.
*Compare* 19 U.S.C. § 1677e(a) & (b) (2000) *with* 19 U.S.C. § 1677e(a) & (b) (2012) and 19
U.S.C. § 1677e(b) (Supp. IV 2016).

when necessary information is lacking, regardless of the reason for its absence. *Nippon Steel*, 337 F.3d at 1381. An adverse inference, on the other hand, may only be drawn where the reason underlying the absence of necessary information was the respondent's failure to cooperate to "the best of its ability," that is, where the respondent failed to do "the maximum it [was] able to do." *Id*. at 1382.

To find a respondent has failed to cooperate to the best of its ability, the Department must perform two tasks:

> First, it must make an objective showing that a reasonable and responsible [respondent] would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. . . . Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

*Id*. at 1382-83 (citation omitted). It is worth noting that the subjective component of the "best of its ability" standard judges what constitutes the maximum effort that a particular respondent is capable of doing, not some hypothetical, well-resourced respondent. Thus, "[a]n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown." *Id*. at 1383. While there is no required formula for Commerce to follow in reaching its conclusion, a reviewing court must be able to conclude that Commerce looked at the respondent's ability to comply as well as its performance in complying. This is consistent with the 1994 amendments to the law, which moved away from the use of the "best information available" to the use of "facts otherwise available" with or without an adverse

inference. In other words, whereas under the former standard, Commerce could use "total [best information available]" for a respondent "whose reporting or verification failure is *so extensive as to make its entire response unreliable*," now, the statute requires that Commerce look subjectively and objectively at the efforts that a particular respondent has made. *Ad Hoc Comm. of AZ-NM-TX-FL Producers*, 18 CIT at 915 n.21, 865 F. Supp. at 865 n.21.

The "best of its ability" standard requires a respondent to "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of [its] ability to do so." *Nippon Steel*, 337 F.3d at 1382. "While that standard does not require perfection, it 'does not condone inattentiveness, carelessness, or inadequate record keeping.'" *NSK Ltd. v. United States*, 481 F.3d 1355, 1361 (Fed. Cir. 2007) (quoting *Nippon Steel*, 337 F.3d at 1382). "[I]ntentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate." *Nippon Steel*, 337 F.3d at 1383; *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("Providing false information and failing to produce key documents unequivocally demonstrate that [a respondent] did not put forth its maximum effort.").

Finally, the purpose for using an adverse inference is carried over from the pre-1994 best information available analysis—to encourage compliance with questionnaire inquiries. *See Ta Chen*, 298 F.3d at 1340 (citing *De Cecco*, 216 F.3d at 1032) (Congress "intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.").

## II.    Specific Findings

As has been seen, the law requires that the record must support a finding that the use of facts available is warranted before Commerce may make the separate, additional finding that an

adverse inference is warranted. *Nippon Steel*, 337 F.3d at 1381; *see also Guizhou Tyre Co. v. United States*, 43 CIT __, __, Slip Op. 19-59 at 7 (May 15, 2019) ("[B]efore Commerce can apply [adverse facts available], it must first determine under § 1677e(a) that information is missing from the record *and* that the gap was caused by a respondent's failure to cooperate."). It should be kept in mind, though, that the facts available and adverse facts available findings are distinct, and Commerce may not use its facts available finding as the sole justification for use of an adverse inference. *See Steel Auth. of India, Ltd. v. United States*, 25 CIT 482, 488, 149 F. Supp. 2d 921, 930 (2001) (citing *Borden, Inc. v. United States*, 22 CIT 233, 261, 4 F. Supp. 2d 1221, 1246 (1998) ("In making its determination that an interested party did not act 'to the best of its ability,' the Department cannot merely recite the relevant standard or repeat its facts available finding. Rather, in order to satisfy its statutory obligations, the Department must be explicit in its reason for applying adverse inferences.").

Since the 1994 amendments to section 1677e, Commerce has adopted the practice, under certain circumstances, of using what it calls "total adverse facts available" when determining dumping margins.[32] "Total adverse facts available" is not defined by statute or agency regulation. Commerce uses "total adverse facts available" administratively to refer to Commerce's application of adverse facts available not only to the facts pertaining to specific sales or information related to factors of production not present on the record, but to the facts respecting all of respondents' production and sales information that the Department concludes is needed for an investigation or review. *Mukand, Ltd. v. United States*, 37 CIT __, __, 2013 WL

---

[32]     It appears that the earliest mention of the phrase "total adverse facts available" in an opinion by this Court was in 1999. *See, e.g.*, *Ferro Union, Inc. v. United States*, 23 CIT 178, 198, 44 F. Supp. 2d 1310, 1329 (1999).

1339399, at *7 (Mar. 25, 2013) (citation omitted), *aff'd*, 767 F.3d 1300 (Fed. Cir. 2014).

Commerce has chosen this practice of applying "total adverse facts available" even though it is

evident that the statute did not anticipate its use. That is, the statute does not authorize the use of

adverse inferences to all of a respondent's information, but only "*in selecting from among the*

*facts otherwise available.*" 19 U.S.C. § 1677e(b)(1)(A) (emphasis added).

Although the statute provided for a picking-and-choosing process, this Court has

sustained Commerce's use of total adverse facts available where (1) the record contained no

usable information for core components of Commerce's dumping analysis (as where the

respondent simply did not answer the questionnaire) and (2) substantial evidence showed that the

respondent was egregious in its failure or refusal to comply with Commerce's requests for

information (as where the respondent concealed information requested by Commerce). *See, e.g.*,

*Mukand*, 37 CIT at __, 2013 WL 1339399, at *7 (citations omitted); *Papierfabrik August*

*Koehler Se v. United States*, 38 CIT __, __, 7 F. Supp. 3d 1304, 1314 (2014). Where, on the

other hand, some of the information could be used, or the deficiency was only "with respect to a

discrete category of information," and a respondent is found not to have complied to the best of

its ability, the use of "partial adverse facts available" is directed by the statute. *Foshan Shunde*

*Yongjian Housewares & Hardware Co. v. United States*, 35 CIT 1398, 1416, 2011 WL 4829947,

at *14 (Oct. 12, 2011).

In sum, courts have held that, in order to apply "total adverse facts available," Commerce

must first find, based on the record, that the use of facts available is warranted with respect to all

requested information. The absence of any usable information, however, is a necessary, but not

sufficient, condition for the application of "total adverse facts available." Before Commerce may

apply total adverse facts available, the record must support a finding that the respondent, both

objectively and subjectively, failed to act to "the best of its ability" to cooperate with Commerce's requests for information, and that thus, the use of adverse facts available was needed to encourage future cooperation. *See Ta Chen*, 298 F.3d at 1340 (citation omitted).


## DISCUSSION

### I.   Shandong's Factors of Production

During the underlying review, Commerce sought information with respect to Shandong's factors of production by way of its Section D questionnaire. Initially, the company was asked to report the actual or estimated amounts of the factors of production that it consumed making the subject merchandise solely on a *CONNUM-specific* basis. In its questionnaire responses, however, Shandong made it clear that, because of its production process and the way it kept its records, it could only report some factors of production (*e.g.*, wire rod used in the wire-drawing workshop) on a CONNUM-specific basis. Shandong did, however, represent that it could report other factors of production (*e.g.*, chemicals and water used in the electrogalvinization, or "EG" workshop) on a production-group basis. *See* National Nail's Mem. Supp. Mot. J. Agency R., ECF No. 34 at 24 ("Unlike Stanley, [Shandong] did not have sophisticated software that recorded material and other [factors of production] consumption for all nails produced through all production stages. The best it could do was to break down its material consumption into thirteen different production groups."). As is provided for in 19 U.S.C. § 1677m(c)(1),[33] Commerce took the representations into account, and agreed that Shandong could report its

---

[33]     "If an interested party, promptly . . . notifies [Commerce] . . . that such party is unable to submit the information requested in the requested form and manner, . . . [Commerce] may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party." 19 U.S.C. § 1677m(c)(1).

factors of production "either on a production-group basis or on a CONNUM-specific basis." Commerce's Fourth Sec. D Suppl. Quest. to Shandong at 16. No matter which reporting method was selected, though, Commerce directed that "it was unacceptable to report a single average [number for factors of production] usage ratio for *all* CONNUMs in [the] Section D database." Final IDM at 36 (emphasis added) (citation omitted).

In addition, Commerce took seriously the provisions of 19 U.S.C. § 1677m(e) (relating to consideration of information submitted by a party that "does not meet all the applicable requirements established by [Commerce]") and 19 U.S.C. § 1677m(d) (relating to information that Commerce finds deficient) and issued supplemental questionnaires in order to obtain usable information on which to base its determination. By issuing these supplemental questionnaires, Commerce complied with Congress's clear preference that information supplied by the parties, even imperfect information, provide the agency the evidence essential for reaching the applicable determination.

In the Remand Results, Commerce found, as it did in the Final Results, that Shandong failed to provide the requested factors of production data in the form and manner requested:

> [Shandong] failed to provide a reliable, accurate database for [factors of production] on a CONNUM-specific basis. In numerous questionnaires, Commerce asked [Shandong] to provide updated databases or to explain why it could not provide its [factors of production] on a CONNUM-specific basis, yet [Shandong] continued to report its [factors of production] on a single average basis. Commerce gave [Shandong] three opportunities to provide its factors of production data on a CONNUM-specific basis and to explain its efforts to report the data on that basis, but it failed to do so. Commerce also provided [Shandong] three opportunities to explain why reporting these data on a CONNUM-specific basis was impossible. However, [Shandong] disregarded Commerce's request to report on a CONNUM-specific basis and continuously *reported factors of production on a single-average basis*, applying the average ratio to more than 100 CONNUMs, despite Commerce's instruction that it was unacceptable to report [factors of production] on a single-average basis, and with no explanation detailing [Shandong's] efforts to provide Commerce with the [factors of production] data in the form and manner requested.

Remand Results at 15-16 (emphasis added). Based on this narrative, Commerce concluded that

none of the factors of production information was usable because necessary factors of production

information was "missing" from the record.

The parties disagree as a factual matter as to whether Shandong provided Commerce with

the factors of production information in the form and manner requested. National Nail maintains

that Shandong reported all of its factors of production either on a CONNUM-specific basis or, as

Commerce permitted, on a production-group basis:

> After several rounds of supplemental questionnaires and responses, [Shandong]
> submitted revised [factors of production] databases in which all of the key [factors
> of production] were reported either on a CONNUM-specific basis (wire rod) or on
> a production-group basis (other materials, labor, coal/water, electricity). Unlike its
> first [factors of production] database, [Shandong's] revised [factors of production]
> database reflected different per-unit consumption amounts for the key [factors of
> production] . . . . [Shandong] explained that it had used different yield rates from
> each of the thirteen different production stages that were derived from actual
> material consumption data collected at each production stage. . . . These
> production group yield rates were then used to calculate the different per-unit
> [factors of production] consumption amounts ultimately reported in the
> "production-group" [factors of production] database.

National Nail's Reply, ECF No. 49 at 4-5 (citations omitted). Put another way, Shandong

maintains that its revised databases contained the factors of production information Commerce

asked for in the form and manner that the Department ultimately agreed to accept, *i.e.*, on a

CONNUM-specific or production-group basis.

For its part, Commerce insists that Shandong's responses did not comply with the

Department's instructions. Commerce takes particular issue with the factors of production

reported on a production-group basis:

> [Shandong] reported certain factors of production on a production-group basis,
> but reported these "factors of production on a single-average basis, applying the
> average ratio to more than 100 CONNUMs, despite Commerce's instruction that
> it was unacceptable to report [factors of production] on a single-average basis."

> Despite receiving multiple opportunities from Commerce to explain its efforts to
> provide the factors of production databases in the form and manner requested,
> [Shandong] never contacted Commerce with questions or explained why it could
> only provide a single-average factors of production usage ratio across all
> production groups.

Def.'s Resp. Cmts. 10 (quoting Remand Results at 16). Commerce, then, maintains that even

though it permitted Shandong to report on a production-group basis, this resulted in reporting

some costs on a single-average basis, which was unacceptable.

National Nail nevertheless maintains that Shandong's production-group database did not

report costs on a single-average basis:

> Unlike [Shandong's] original "single-average" [factors of production] database
> which reflected only one average per-unit consumption amount for most of the
> [factors of production], the "production-group" [factors of production] database
> reflected a range of different per-unit consumption amounts for the [factors of
> production] that accounted for up to 98 percent of the total nail weight, as derived
> from yield rates calculated from thirteen different production stages.
> Fundamentally, [Commerce] failed to acknowledge that these differences in the
> final version of [Shandong's] production-group [factors of production] were
> ultimately more specific than the originally reported single-average [factors of
> production] database.

> Different CONNUMs may have reported identical [factors of production
> amounts], but only because these CONNUMs all went through the same
> production groups. [Commerce] unreasonably assumed that different CONNUMs
> would have different per-unit consumption amounts even though these nails were
> essentially produced in the same manner because they all went through the same
> production stages. Slight differences in CONNUM characteristics would not
> necessarily result in different per-unit [factors of production] consumption
> amounts.

National Nail's Reply 5. Therefore, according to National Nail, nails of different kinds, classified

as different CONNUMs, can go through the same production stages and consume the same, or

nearly the same, amount of inputs, as with, for example, the chemicals and water inputs used in

the electrogalvinization workshop. *See* Shandong's Third Suppl. Sec. A and C and Fourth Suppl.

Sec. D Questionnaire Resp. (July 21, 2015), P.R. 208, ECF No. 52-33 at 33 (referencing

workshops, including the electrogalvinization workshop, where "the chemicals are the main [factors of production] used to treat . . . semi-finished nails. All the nails going through [a] specific workshop are processed together in a container full of liquid (water added with chemicals). There is no method or necessity to allocate the chemicals on a CONNUM-specific basis.").

For National Nail, Shandong ultimately supplied Commerce with factors of production information in the form and manner requested, *i.e.*, consumption amounts of some factors of production were reported on a CONNUM-specific basis (*e.g.*, the amount of wire rod used in the wire-drawing workshop), and the consumption amounts of other factors of production were reported on a production-group basis (*e.g.*, chemicals and water used in other workshops, such as electrogalvinization), as permitted by Commerce. So, according to National Nail, while it may at first blush appear as though Shandong was reporting the consumption of certain factors of production on a single-average basis, that is, the same number for multiple CONNUMs, the number was not an average but represented the actual consumption of the factor of production.

National Nail is right. An examination of the treatment of two different kinds of nails, identified by different CONNUMs, illustrates the point. For example, Shandong reported low-carbon wire rod as a factor of production for two different CONNUMs.[34] For each CONNUM, Shandong reported different per-unit consumption amounts of wire rod, *i.e.*, more

---

[34]     In Shandong's questionnaire responses, the CONNUMs were identified by number as 207201501061111 and 207201501091111.     *See* Shandong's Second and Third Suppl. Sec. D Resp. (June 5, 2015), C.R. 136 Ex. TSD-1 at 1-2, ECF No. 51-6 (revised factors of production database). Shandong reported different low-carbon wire rod consumption amounts for each of these CONNUMs of 1.07427 kg. and 1.00771 kg., respectively. *Id.* Shandong also reported different per-unit consumption amounts of galvanized wire-drawing powder for each of these CONNUMs of 0.002748573 kg. and 0.002578287 kg., respectively. *Id.*

rod for bigger nails. Galvanized wire-drawing powder,[35] a lubricating material, was another

factor of production for both CONNUMs. For each, Shandong reported different per-unit

consumption amounts of galvanized wire-drawing powder. *See* Shandong's Second and Third

Suppl. Sec. D Resp. (June 5, 2015), C.R. 136 Ex. TSD-1, ECF No. 51-6 (revised factors of

production database).

For the same two types of nails, Shandong reported consumption of other inputs, such as

chemicals and water, on a production-group basis. As an example, "Electrogalvinization Nails"

are one of Shandong's thirteen production groups that went through the electrogalvanization

workshop. The electrogalvinization workshop includes a thirteen-step production process in

which a zinc coating is applied to nails to protect against corrosion. *See* Shandong's Sec. C and

D Questionnaire Resp. (Jan. 13, 2015), P.R. 95 Ex. D-1(2) (electrogalvanization flow chart of

production steps). Three of those steps are "washing," one is "rinsing," and one is "hot water

washing." Nails went through each step of this process "in bulk" amounts, and tracking the

consumption amount of, for example, water, on a per-CONNUM basis, according to Shandong,

was not feasible. *See* Shandong's Third Suppl. Sec. A and C and Fourth Suppl. Sec. D

Questionnaire Resp. at 33. Because per-CONNUM reporting was not feasible, Shandong

reported consumption of this factor of production on a production-group basis. Commerce found

that the amounts consumed were reported on a single-average basis, because the consumption

rate for both kinds of nails was the same. *See* Final IDM at 39. In fact, though, Commerce's

finding cannot be reconciled with the record evidence showing that the amounts consumed were

---

[35]      Wire-drawing powder is a lubricant used to reduce friction between the drawn
wire and the wire-drawing die, among other uses. *See Wire Drawing Die And Auxiliaries*, Wuxi
Anber Machine Co., Ltd., http://www.wiredrawingchina.com/spare-parts/Wire-Drawing-po
wder.htm (last visited May 30, 2019) (describing wire-drawing powder uses).

reported on a production-group basis and that the amounts consumed were reported to be identical because, as best as could be determined, they were the same. Shandong's Sec. D Questionnaire Resp. (Jan. 13, 2015), P.R. 94 Ex. D-8 ("FOP Water Consumption") (indicating, for example, 0.002 kilograms of water consumed per one kilogram of nails).

These are but two kinds of nails where record evidence demonstrates that Shandong reported estimated consumption amounts of factors of production on a per-CONNUM basis, where it was able to do so, and otherwise on a production-group basis. Though equal amounts of an input, *e.g.*, water, were consumed for both kinds of nails, this does not mean that water consumption was reported on a single-average basis, but rather that the reported factor of production number was the amount consumed by each production group. As noted, just because the amount of water consumed when a basket of nails is dipped in a pool is the same for different nails does not make the reported number an average. Since the information that Commerce requested was provided in accordance with its instructions, *i.e.*, to report either on a CONNUM-specific basis *or* a production-group basis, its finding that Shandong "disregarded Commerce's request to report on a CONNUM-specific basis and continuously reported factors of production on a single-average basis" lacks the support of substantial evidence. Remand Results at 16.

Additionally, the court finds that substantial evidence does not support Commerce's "best of its ability" finding used to apply an adverse inference. It is difficult to see how Shandong can be said to have failed to put forth its maximum effort, under the objective and subjective standards set out in *Nippon Steel*,[36] where its revised factors of production database contained

---

[36]          First, Commerce must show that "a reasonable and responsible [respondent]

(footnote continued . . .)

the information Commerce asked for in the form and manner it permitted Shandong to use (*i.e.*, on a CONNUM-specific or production-group basis). *Nippon Steel*, 337 F.3d at 1382-83 (citation omitted). To the extent that Commerce grounded its decision to apply total adverse facts available on this "missing" factors information, the use of total adverse facts available is not supported by substantial evidence.

Moreover, the adverse facts available finding with respect to factors of production is not in accordance with law because Commerce completed none of the steps required by *Nippon Steel* to apply total adverse facts available. *Nippon Steel*, 337 F.3d at 1382-83. Here, Commerce relied on a recitation of its facts available findings as a basis for its decision to apply an adverse inference, which is not enough under the statute. *See Steel Auth. of India*, 25 CIT at 488, 149 F. Supp. 2d at 930 (citation omitted) ("In making its determination that an interested party did not act 'to the best of its ability,' the Department cannot merely recite the relevant standard or repeat its facts available finding. Rather, in order to satisfy its statutory obligations, the Department must be explicit in its reason for applying adverse inferences."). In other words, Commerce must make it possible for a reviewing court to discern its reasons for finding that Shandong, specifically, did not put forth its maximum effort before employing adverse inferences.

Finally, 19 U.S.C. § 1677m(e) provides that Commerce "shall not decline to consider information that is submitted by an interested party" that "does not meet all the applicable requirements established by [Commerce]," if five conditions are met. 19 U.S.C. § 1677m(e). One

---

would have known that the requested information was required to be kept and maintained" under applicable law. *Nippon Steel*, 337 F.3d at 1382. Second, Commerce must show that "the respondent['s] . . . failure to fully respond is the result of [its] . . . : (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records." *Id.* at 1382-83.

of the conditions is that "the interested party has demonstrated that it acted to the best of its

ability in providing the information and meeting the requirements established by [Commerce]

with respect to the information." *Id.* § 1677m(e)(4). Here, the facts demonstrate that Shandong

made this showing, and Commerce has not questioned the other four requirements. Thus,

Commerce erred by declining to consider the factors of production information Shandong placed

on the record.

Based on the foregoing, on remand Commerce is directed to use the factors information

Shandong reported (1) on a CONNUM-specific basis; and (2) on a production-group basis, to

determine normal value.


II.     **Shandong's U.S. Sales**

In the Remand Results, Commerce found, as it had in the Final Results, that Shandong

"failed to provide a reliable, accurate database for U.S. sales." Remand Results at 16; *see also*

Final IDM at 43. By way of explanation, Commerce stated:

> [Shandong] did not provide the necessary information requested in Commerce's
> questionnaires, including why certain sales data were not included for two months
> [*i.e.*, November and December 2014], when [Shandong] had submitted monthly
> internal financial statements for the other months that had reported sales data in
> its original sales reconciliation . . . . Commerce provided [Shandong] two
> opportunities to remedy and explain deficiencies in its initial questionnaire
> response. . . . In responding, [Shandong] did not include two [different] months of
> sales data from the period of review [*i.e.*, August and December 2013] and failed
> to provide an explanation for how the sales reconciliation and supporting
> worksheets tied to its financial statements.

Remand Results at 16-17. So, Commerce found that Shandong initially did not supply sales data

for two of the twenty-four months requested (November and December 2014, both outside of the

period of review), and that later, it changed the quantity of merchandise sold for two of the

twelve months in the period of review (August and December 2013), without explaining the

change. Commerce also found missing a narrative explanation for how Shandong's sales reconciliation and supporting worksheets tied to its financial statements. Thus, Commerce concluded that the use of facts available was warranted.

In addition, Commerce found that Shandong's "repeated unexplained revisions to its U.S. sales database support[ed] a determination that it did not put forth the maximum effort in responding to the Department's request for information and thus it did not cooperate within the meaning of" 19 U.S.C. § 1677e(b). Final IDM at 49.

National Nail argues that Commerce's decision to extend adverse facts available with respect to its U.S. sales information (thus contributing to its determination to assign a rate based on total adverse facts available) is not supported by substantial evidence and not in accordance with law. For National Nail:

> [Shandong] had complied fully with the Department's first supplemental questions on the sales reconciliation and there were no outstanding deficiencies. The Department is incorrect to assert that there was a pattern of unresponsiveness in [Shandong's] responses to the Department's questions on the sales reconciliation.
>
> The Department does not dispute that the sales values in [Shandong's] sales reconciliation tie perfectly to the accounting records and audited financial statements. The Department also does not dispute that it never gave [Shandong] the opportunity to fix or explain why the sales quantities reported for two months [of the period of review, *i.e.*, August and December 2013] had changed.
>
> The Department never addressed the fact that the discrepancy in the sales quantities were *de minimis* (less than one percent of total sales quantities). It is simply not credible for the Department to assert that such *de minimis* differences in sales quantities were enough to call into question the overall credibility of [Shandong's] sales reconciliation, when it is undisputed that [Shandong's] reported sales values reconciled fully to its audited financial statements.
>
> In short, the discrepancies regarding [Shandong's] sales reconciliation do not warrant even the application of neutral facts available, and most certainly do not

support the application of total [adverse facts available]. These were easily explainable discrepancies of trivial amounts[37] that do not warrant such a punitive application of total [adverse facts available], particularly when [Shandong] was not given the opportunity to explain or remedy the discrepancies cited by the Department.

NN's Cmts. at 7-8.

Substantial evidence does not support Commerce's decision to use facts available as to all of Shandong's U.S. sales. This is because, except with respect to the unexplained revisions to the August and December 2013 data, the information Commerce found was "missing" is not, in fact, missing. First, the November and December 2014 sales data is not missing from the record. While it is true that Shandong's *original* sales reconciliation (provided in the mid-January 2015 Submission) did not include November and December 2014 sales data, the record shows that Shandong *timely* provided this information in response to a supplemental questionnaire[38] in its

---

37    In its original sales reconciliation, Shandong reported a sales quantity for August 2013 of 82,576.51 kg. and for December 2013 of 179,860.32 kg., and revised those amounts downward in its revised reconciliation to 78,680.83 kg. and 169,261.92 kg., respectively. *See* Shandong's Sec. C and D Questionnaire Resp. (Jan. 13, 2015), app. 1 (original sales reconciliation), C.R. 62, 63, ECF No. 51-3; Shandong's Third Suppl. Sec. A and C and Fourth Suppl. Sec. D Resp., Ex. 3rd SSAC-23 (revised sales reconciliation), ECF No. 51-5.

38    In response to Commerce's June 2015 supplemental questionnaire, asking for the November and December 2014 data, Shandong provided that data along with an explanation as to why it was omitted. Commerce found:

In its next supplemental questionnaire response, [the July 2015 Submission, Shandong] submitted a revised sales reconciliation that reported the missing sales data for two months of 2014 and explained that data for these two months were previously absent from its response because the data had not been prepared when the original sales reconciliation chart was submitted in [the mid-January 2015 Submission]. Additionally, [Shandong] provided an explanation for how its revised sales reconciliation tied to the monthly general ledger and values listed for each month in the general ledger tied to [Shandong's] audited annual financial statements for . . . 2013 and 2014. Finally, [Shandong] provided an explanation for the revisions to the revised U.S. sales database that it submitted in response to

(footnote continued . . .)

July 2015 Submission, and explained it was "previously absent from its response because the data had not been prepared when the original sales reconciliation chart was submitted" in the mid-January 2015 Submission. Final IDM at 46. Although Commerce found otherwise, *i.e.*, that "as [Shandong] was preparing its [mid-January 2015 Submission] between when it received the original questionnaire [dated November 20, 2014] and when it was due [*i.e.*, January 27, 2015], it should have been able to provide information on those last two months of . . . 2014 based on the monthly internal financial statements admittedly in its possession,"[39] it is difficult to see how demanding complete sales information twenty-seven days after Shandong closed its books for the year was reasonable. Final IDM 44-45. Nor is it immediately obvious why information for the two months of sales data starting three months after the close of the period of review was so important. Nevertheless, since there is no dispute that the information was placed on the record *on time* in a supplemental submission solicited by Commerce, the Department's claims that information is missing from the record are not supported by substantial evidence.

Second, in the Final Results, Commerce, as it had in the Preliminary Results, found that Shandong provided a narrative explanation of how its sales reconciliation and supporting worksheets tied to its financial statements. Commerce stated:

> [Shandong] provided an explanation for how its revised sales reconciliation tied

---

> the Department's supplemental Section D questionnaire. Specifically, [Shandong] submitted an exhibit that detailed the comparisons by each variable of the changes between the two different U.S. sales databases.

Final IDM at 46.

[39]     The admission to which Commerce referred is, apparently, Shandong's statement in its December 2014 Submission that "it maintains monthly internal financial statements (*i.e.*, balance sheets and profit & loss statements), which list the business income net of profit." Final IDM at 44.

> to the monthly general ledger and values listed for each month in the general
> ledger tied to [Shandong's] audited annual financial statements for . . . 2013 and
> 2014. [Additionally, Shandong] provided an explanation for the revisions to the
> revised U.S. sales database that it submitted in response to the Department's
> supplemental Section D questionnaire. Specifically, [Shandong] submitted an
> exhibit that detailed the comparisons by each variable of the changes between the
> two different U.S. sales databases.

Final IDM at 46; Prelim. Dec. Mem. at 15 ("In its Third Supplemental Questionnaire Response,

[Shandong] addressed the Department's clarification questions and submitted a revised sales

reconciliation, as requested, including the two months of sales data that were omitted in its

original sales reconciliation."). Again, the information was placed on the record in a timely

manner. On remand, Commerce did not find that the numbers in the sales reconciliation failed to

tie. Thus, substantial evidence does not support Commerce's finding that U.S. sales data was

missing for November or December 2014, or that Shandong failed to provide the requested

narrative explanation.

As to the August and December 2013 sales data, the record does not support Commerce's

finding on remand that Shandong "did not include [these] months of sales data from the period of

review" in its sales reconciliation, as Commerce found on remand. Remand Results at 17. The

record shows that Shandong *timely* submitted a revised reconciliation with *changes* to its sales

data for August and December 2013 in the July 2015 Submission. Moreover, Commerce found

that the changes to August and December 2013 sales numbers amounted to a *de minimis*

decrease, approximately one percent, in the total reported sales to the United States. This being

the case, Commerce's findings with respect to the sales reconciliation do not support a

determination of facts available.

It is true, though, with respect to the unsolicited changes to the August and December

2013 sales data, that Shandong did not provide an explanation, as is required by the regulations.

*See* 19 C.F.R. § 351.301(b)(2) ("If the factual information is being submitted to rebut, clarify, or correct factual information on the record, the submitter must provide a written explanation identifying the information which is already on the record that the factual information seeks to rebut, clarify, or correct, including the name of the interested party that submitted the information and the date on which the information was submitted."). As such, and because the revisions to the August and December 2013 sales data were submitted roughly a month before the fully extended deadline for the Preliminary Results, Commerce did not act unreasonably by declining to issue another supplemental questionnaire asking Shandong to explain its revisions. Shandong's failure to provide an explanation for *de minimis* changes in the two months of sales data, though, was insufficient to justify Commerce's finding that none of the sales data was usable, nor was it sufficient to provide the sole basis for drawing an adverse inference with respect to all of the sales information on record. Indeed, since there does not seem to be any question about the accuracy of the sales data, it is not unreasonable for Commerce to accept an explanation on remand. If Commerce finds the explanation to be sufficient, it shall use the revised August and December 2013 sales data in its analysis. If the explanation is not sufficient, then, the Department may use facts available to fill in any gaps in that information.

Based on the foregoing, it appears that the November and December 2014 sales data and the requested narrative explanation that the Department claims was missing from the record were on the record at the time of the Preliminary Results. Thus, except with respect to the unexplained revisions to the August and December 2013 sales data, Commerce's decision to apply facts available with respect to the sales reconciliation and U.S. sales data was not supported by substantial evidence.

In addition, the Department's application of an adverse inference with respect to any of

the sales information is not in accordance with law because, as with the factors of production,

Commerce took none of the steps required by *Nippon Steel*. *Nippon Steel*, 337 F.3d at 1382-83;

*see also Steel Auth. of India*, 25 CIT at 488, 149 F. Supp. 2d at 930 (citation omitted). Without

the objective and subjective findings required by *Nippon Steel*, Commerce has failed to provide

the court with a discernable reason for finding that Shandong was not doing its best to comply

with Commerce's requests for information. Finally, it bears repeating that the use of adverse

inferences when determining a respondent's rate is intended to create "a deterrent to

non-compliance," which as far as can be seen is not needed to encourage Shandong's efforts to

supply requested information. *Ta Chen*, 298 F.3d at 1340 (citing *De Cecco*, 216 F.3d at 1032).

Accordingly, on remand, Commerce must use the sales information Shandong provided

in making its comparison of normal value and the price at which the subject merchandise was

sold in the United States, including (1) sales data from November and December 2014, although

it is hard to see how information outside the period of review can be put to use, and (2) the

narrative explanation Shandong provided to tie its sales reconciliation and supporting

documentation to its financial statements. As to the unexplained revisions to sales data for

August and December 2013, Commerce shall solicit an explanation in accordance with this

opinion. In no event, however, may the Department use an adverse inference when selecting

from among the facts on the record relating to sales.


III.     **Shandong's Affiliate Jining Dragon's Shooting Nails**

Related to Commerce's finding that necessary U.S. sales information was missing from

the record, is the Department's finding that Shandong failed to provide "sufficient information

showing that [Jining Dragon] produced and sold only *non-subject* merchandise to the United

States during the [period of review]." Remand Results at 16 (emphasis added).

The Order excluded certain fasteners from its scope, *i.e.*, "fasteners suitable for use in powder-actuated hand tools, not threaded and threaded, which are currently classified under [Harmonized Tariff Schedule of the United States subheadings] 7317.00.20 and 7317.00.30." Order, 73 Fed. Reg. at 44,961. Before Commerce, Shandong argued that Jining Dragon's "shooting nails" fell within this exclusion. Based on this representation, Commerce conditionally withdrew its request that Shandong provide Jining Dragon's production and U.S. sales databases for the allegedly excluded shooting nails, but continued to seek information on whether the nails were, in fact, excluded from the scope of the Order. That is, based on the information provided regarding Jining Dragon's shooting nails, the Department indicated that it would "consider whether it is necessary to request that [Jining Dragon] submit a Section C and D database." Commerce's Letter to Shandong re: Shandong's Request for Excusal (July 2, 2015), P.R. 194, ECF No. 52-31.

Ultimately, Commerce found that Shandong failed to show that the shooting nails met the criteria for exclusion from the Order. For Commerce, because Shandong failed to show that the shooting nails were excluded from the Order, it was required to provide production and sales information for Jining Dragon's U.S. sales of shooting nails during the period of review. In the Remand Results, Commerce stated:

> [Shandong] failed to provide requested details regarding sales and [factors of production] data for [Jining Dragon's] shooting nails, instead claiming that shooting nails were excluded from the scope of the *Order* without substantiating its claim. As such, Commerce determined that [Shandong] failed to explain adequately why shooting nails produced and exported by [Jining Dragon] are outside the scope of the *Order*, warranting the application of adverse inferences in selecting from the facts otherwise available. Therefore, pursuant to [19 U.S.C § 1677e(a)(2)(A), (B), and (C)], Commerce finds that the application of facts available is warranted because [Shandong] failed to provide necessary information requested by Commerce, in the form and manner requested, and

significantly impeded our ability to conduct the review. Moreover, because [Shandong's] deficiencies were so pervasive, impeding Commerce's ability to conduct its review, and [Shandong] did not cooperate to the best of its ability, Commerce determined that total [adverse facts available], consistent with [subsection 1677e(b)], was warranted.

Remand Results at 17-18.

National Nail maintains that Commerce never informed Shandong that it had failed to demonstrate to Commerce's satisfaction that Jining Dragon's shooting nails were excluded from the Order. According to National Nail, the Department failed to "give [Shandong] any request or opportunity to submit the shooting nails sales and [factors of production] data." NN's Cmts. 9. In National Nail's view, Commerce "inappropriately and arbitrarily jumped from giving [Shandong] a conditional excusal to not report its shooting nail data to giving [Shandong] total [adverse facts available]." NN's Cmts. 9.

Commerce counters that it "specifically requested [sales and factors of production] information [for the shooting nails], in addition to evidence demonstrating whether the shooting nails were subject merchandise--specifically, whether the shooting nails were used in a 'powder-actuated hand tool,' as required by the exclusion in the order." Def.'s Resp. Cmts. 13-14 (citing Final IDM at 52-53). Further, Commerce maintains that it "also informed [Shandong] that it required answers to all other portions of the questionnaires pertaining to [Jining Dragon's] alleged shooting nails because the information submitted did not sufficiently address whether [its] nails were excluded from the order." Def.'s Resp. Cmts. 14 (citing Final IDM at 52-53). Shandong, however, did not provide the requested information.

The record here supports Commerce's decision to use facts available with respect to Jining Dragon's shooting nails. The Department asked for information about the shooting nails to determine whether or not they were within the scope of the Order, *i.e.*, whether they were used in

a "powder-actuated hand tool." For example, in one of the supplemental questionnaires Commerce instructed, "For two product codes of shooting nails . . . please provide product specifications or model diagrams, of each product type's head style, point style, shank style, and *the hand tool with material used in the hand tool to shoot this nail, along with supporting documentation*." Final IDM at 54 (emphasis added). Shandong's responses to the supplemental questionnaires were insufficient because Shandong "simply stated . . . again without any supporting evidence that the shooting nails were used in a 'shooting gun' and that material used was 'gunpowder.'" Final IDM at 54. Further, "[w]hile [Shandong] again provided the same product specifications and sales packages for [its affiliate Jining Dragon's] two types of shooting nails, these documents did not contain any information regarding the hand tool or material used in the hand tool, as specifically requested by the Department." Final IDM at 54. Without the information the Department requested concerning the hand tool used to shoot the nail, including the supporting documentation, Commerce could not determine whether the terms of the exclusion were satisfied.[40] Thus, substantial record evidence supports Commerce's decision to use facts available to fill in necessary information that was missing from the record regarding shooting nails.

Additionally, Commerce's application of an adverse inference was reasonable because the record supports the conclusion that Shandong did not act to the best of its ability to cooperate with the Department's requests for shooting nails information under the objective and subjective standards in *Nippon Steel*. That is, there can be little doubt that "a reasonable and responsible

---

[40]   The Order excluded "fasteners suitable for use in powder-actuated hand tools, not threaded and threaded, which are currently classified under [Harmonized Tariff Schedule of the United States subheadings] 7317.00.20 and 7317.00.30." Order, 73 Fed. Reg. at 44,961.

[respondent]" that sells a variety of steel nails in the United States, some of which it believed were not subject to the Order, would have known that it should maintain information that would support such an exclusion, *i.e.*, the kind of hand tool used to drive in the nail. *Nippon Steel*, 337 F.3d at 1382. Moreover, if the exporter of those allegedly excluded nails did not have the requested supporting documentation in its possession, it should have asked for the documents from its affiliated company. *See Nippon Steel*, 337 F.3d at 1383 (an adverse inference may be drawn "only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown"). Here, Commerce reasonably sought information as to whether Jining Dragon's shooting nails were within the scope of the Order that surely was in Shandong's hands or in the hands of Jining Dragon from which it could be obtained. Indeed, in its case brief (*i.e.*, after the close of the fact-gathering stage and the publication of the Preliminary Results), Shandong conceded that it did not provide "the technical description of the powder-actuated nail gun" that Commerce requested, claiming that "that information [was] not in the possession of [Shandong]." Shandong's Case Br. (Nov. 2, 2015), P.R. 245 at 1. Apparently, Shandong did not obtain this information from Jining Dragon because it never asked for it.

In none of Shandong's questionnaire responses did it claim that it did not have, or could not obtain, the requested information. *See* Final IDM at 55. Accordingly, the decision to apply adverse facts available with respect to Shandong's shooting nails information is supported by substantial evidence and is in accordance with law.

Commerce notes the absence of reliable information as to shooting nails as a reason to apply total adverse facts available. While it is doubtful that the Department would contend that

the lack of information on shooting nails alone was sufficient to apply total adverse facts

available to Shandong's U.S. sales, there is little doubt that the absence of sales information for

imports constituting 0.001 of total sales would be insufficient to support the use of total adverse

facts available.


## CONCLUSION and ORDER

Commerce's application of total adverse facts available in the Remand Results is neither

supported by substantial evidence nor in accordance with law. That is, neither the law nor the

facts support the Department's findings (1) that none of Shandong's factors of production or its

U.S. sales information was usable, (2) that Shandong failed to comply with Commerce's requests

for production and sales information to the best of its ability, and (3) that a rate of 118.04 percent

was legally and factually justified. Therefore, it hereby

**ORDERED** that the Remand Results are sustained in part and remanded; it is further

**ORDERED** that, on remand, Commerce issue a redetermination that complies in all

respects with this Opinion and Order, is based on determinations that are supported by

substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that, on remand, Commerce shall:

(1) calculate a rate for Shandong:

(a) with respect to Shandong's factors of production, Commerce shall use the

information Shandong reported (i) on a CONNUM-specific basis, and (ii) on a production-group

basis, to determine normal value;

(b) with respect to Shandong's U.S. sales information, Commerce shall use the

information Shandong provided, including but not limited to sales data for November and

December 2014 and the narrative explanation Shandong provided to tie its sales reconciliation and supporting documentation to its financial statements, in making its comparison of normal value and the price at which the subject merchandise was sold in the United States. With respect to Shandong's unexplained revisions to the August and December 2013 sales quantities, Commerce shall conduct its analysis in accordance with this opinion; and

(c) with respect to Jining Dragon's shooting nails, Commerce shall use facts available in filling in missing necessary information, and may draw an adverse inference with respect to information regarding the period of review sales of shooting nails; however, Commerce may not use the deficiencies in Jining Dragon's shooting nails information as a basis for using total adverse facts available; and it is further

**ORDERED** that the remand results shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.

/s/ Richard K. Eaton
Richard K. Eaton, Judge

Dated: June 12, 2019
       New York, New York